**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

PRECISION DISCOVERY, INC., f/k/a
PRECISION DISCOVERY, LLC

Plaintiff,

v.

HITACHI VANTARA CORPORATION f/k/a
HITACHI DATA SYSTEMS and
COLD CREEK SOLUTIONS, INC.

Defendants.

---

## COMPLAINT AND JURY DEMAND

Plaintiff Precision Discovery, Inc. f/k/a Precision Discovery, LLC ("Precision," the "Company" or "Plaintiff"), as and for the Complaint in this action against Defendants Hitachi Vantara Corporation f/k/a Hitachi Data Systems ("HDS") and Cold Creek Solutions, Inc. ("Cold Creek"),[1] alleges and states as follows:

### PRELIMINARY STATEMENT

1.     Beginning in approximately January 2012, HDS and Cold Creek, acting on their own behalf, and in conjunction with Hitachi Data Systems Credit Corporation ("HDSCC"), began leasing IT infrastructure equipment and data storage hardware, software and related services to Precision Discovery pursuant to the terms of an agreement.

---

[1]     HDS and Cold Creek are hereinafter collectively referred to as "Defendants."

2.      However, following certain questionable business transactions discovered in mid-2017, including a fraudulent and deceptive agreement provision that would have effectively required Precision Discovery to cease its core business operations, Precision Discovery retained independent forensic accountants to conduct an extensive review of all prior equipment leases into which Precision Discovery had entered with HDSCC, which also inextricably involved HDS and/or Cold Creek.

3.      As a result of their investigation, Precision determined that, over the prior six years, HDS, Cold Creek and HDSCC – acting in conjunction with one another – had worked with a rogue and disloyal Precision employee to dupe Precision into either continuing to pay for equipment well beyond the time at which Precision should have owned the equipment outright or paying exorbitant amounts for unnecessary equipment and service agreements.  Specifically, Precision Discovery's Chief Information Officer ("CIO") and Head of IT at the time, Howard Holton, who was responsible for negotiating the technological requirements and details of the agreements for the IT equipment leased by HDSCC, and which had been put in place by HDS and Cold Creek, had received tens of thousands of dollars from Defendants in the form of both cash and lavish "gifts."

4.      Essentially, Defendants had successfully worked together to bribe and improperly coopt their primary contact person within Precision into accepting a deal that was both a clear conflict of interest and against Precision Discovery's interests, technology needs and all ethical and legal standards, all for the purpose of tricking the Company into paying HDSCC large sums of money to which it had no legitimate right – and which would allow Defendants to book substantial revenue and commissions on an

entirely bogus transaction that primarily consisted of millions of dollars of phantom profits to which Defendants were not entitled.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over Precision Discovery's claims against Cold Creek and HDS pursuant to 28 U.S.C. § 1332(a)(1), as the parties are citizens of different states and the amount in controversy is in excess of $75,000.  This Court also has jurisdiction over Precision Discovery's claim arising under the Civil RICO statute pursuant to 28 U.S.C. § 1331, as these claims involve federal questions, and supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

6.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to Precision Discovery's claims against Defendants occurred in this district.

## PARTIES

7.      Precision Discovery is a New York corporation with its principal place of business located in New York, New York.  Precision Discovery is a premier national eDiscovery service provider, and, as such, provides its clients with data processing, hosting and storage, as well as other services related to client data.  Precision Discovery's Colorado-based data center was responsible for supporting Precision Discovery's nationwide operations, including its New York-based headquarters.

8.      HDS is a Delaware corporation with its principal place of business in Santa Clara, California, and is a wholly owned subsidiary of Hitachi Ltd.  HDS provides mid-range and high-end computer data storage systems, software and services.

9.      Upon information and belief, HDS conducts extensive business in the state of Colorado, including, *inter alia*, the transactions at issue in this action and maintaining an office located at 9800 Pyramid Ct., Suite 200, Englewood, CO 80112.

10.     Cold Creek is a Colorado corporation with its principal place of business located in Greenwood Village, Colorado.  Cold Creek is an IT products and services provider, and is an authorized HDS equipment reseller.

## FACTUAL ALLEGATIONS

### The Lease Agreement

11.     On or about January 13, 2012, Precision Discovery and HDSCC (the Hitachi finance company that HDS utilized) entered into Lease Agreement Number 11MFS1227 (the "Lease Agreement") governing lease transactions between HDSCC (as lessor) and Precision Discovery (as lessee).

12.     The specific equipment and services provided by HDS and Cold Creek, that HDSCC leased to Precision Discovery pursuant to the terms of the Lease Agreement (for which HDSCC was merely the financing pass through entity, with HDS and Cold Creek being the true IT vendors) were identified in accompanying schedules, which the parties negotiated and executed from time to time, beginning in or around January 2012.

13.     To that end, acting in concert with and on behalf of HDSCC (as well as in their own interest), both HDS and Cold Creek were intimately involved in negotiating the various schedules to the Lease Agreement.

14.     As a result of the Lease Agreement and the related schedules, nearly all of Precision Discovery's IT infrastructure and data storage equipment in its Denver,

Colorado data center (the "Data Center") consist of HDS hardware and software, and HDS engineers were critical in helping build Precision Discovery's primary data center.

15.     Indeed, based upon the highly technical nature of the equipment being leased, Precision specifically expected to and did rely upon engineers and technical employees provided by HDS and Cold Creek to recommend the appropriate hardware for Precision's needs.  To that end, HDS and Cold Creek were to provide engineers to determine the specific equipment that Precision required to properly conduct its business and, based upon the determinations made by these engineers, HDS and Cold Creek were obligated to provide appropriate systems for Precision's individualized needs.

16.     Specifically, in leasing datacenter hardware, Precision required the assistance of HDS and Cold Creek engineers to determine the size and features of the necessary equipment, and Precision was inherently dependent upon HDS and Cold Creek's recommendations (as well as any Precision employee who controlled the relationship with those vendors), a fact of which Defendants were at all times fully aware.  Put differently, Defendants' relationship with Precision was very different from that of a run-of-the-mill lessor and lessee, in that Defendants were obligated and required both to determine the necessary and appropriate equipment for Precision's purposes and provide it as well.

17.     Therefore, at all relevant times, both HDS and Cold Creek had intricate and detailed knowledge of Precision Discovery's IT infrastructure and data storage needs.

18.     At all relevant times, representatives of HDS and Cold Creek were involved with the negotiation of the hardware and software that HDSCC would lease to Precision Discovery for use in its Data Center pursuant to the terms of the Lease Agreement, and Defendants played an integral role in the finalization and execution of the various schedules to the Lease Agreement.  Indeed, Plaintiff has not been able to identify any employee of HDSCC who played a prominent role in any of the transactions involved in this matter, including but not limited to with regard to Schedule J to the Lease Agreement.

19.     By way of example only, HDS Field Engineer Mike Johnson and HDS Sales Engineer Robert Munoz had full access to the HDS Command Suite 8 software that Precision Discovery utilized and knew that Precision Discovery had 2.38 petabytes[2] ("PB") of data storage.

20.     Likewise, on or about February 2, 2015, HDS Master Strategic Initiatives Consultant Scott Davis wrote to a potential HDS client stating that Precision Discovery had approximately 2.5PB of HDS data storage equipment.

21.     The IT infrastructure and data storage hardware that Precision Discovery leased pursuant to Schedules A through I to the Lease Agreement provided sufficient data storage for Precision Discovery's business operations and data storage needs.[3]

22.     However, and despite having direct knowledge of Precision Discovery's IT infrastructure and data storage needs, beginning in June 2016, representatives of HDS

---

[2]     One petabyte of data is equal to 1,024 terabytes ("TB") of data or 1,048,576 gigabytes ("GB") of data.

[3]     Though the equipment was generally sufficient to satisfy Precision Discovery's storage needs, as described below, it became apparent that all of these transactions, even those for equipment suitable for Precision's needs (though far from all of the equipment was), were part and parcel of a long-term fraudulent scheme between HDS, Cold Creek and HDSCC designed to steal millions of dollars from Precision Discovery.

and Cold Creek secretly worked with a disloyal Precision Discovery employee to deceptively and fraudulently induce Precision Discovery into agreeing to a new schedule, Schedule J, to the Lease Agreement ("Schedule J"), which Defendants were at all times aware was grossly unnecessary, insufficient and unsuitable for handling the Company's data storage needs.

**Howard Holton's Double-Dealing Relationship with HDS and Cold Creek**

23.     HDS and Cold Creek were only successful in their efforts to fraudulently induce Precision Discovery into such a confiscatory and, ultimately, illegal transaction by surreptitiously conspiring with Precision Discovery's then-Chief Information Officer ("CIO"), Howard Holton ("Holton").   While ostensibly a Precision Discovery employee, Holton's conduct, as described below, makes clear that he was in fact, a double agent, working for Defendants to defraud Plaintiff out of millions of dollars.   This relationship created obvious, irreconcilable and irrevocable conflicts of interests that made any transactions entered into by or through these individuals and entities with or on behalf of Precision Discovery inherently improper, unenforceable and fraudulent.

24.     In fact, Plaintiff has come to learn that Defendants' unethical and unlawful conduct against Precision Discovery was not limited to the single instance of the Schedule J transaction, but instead was part of a multi-year scheme to systematically overcharge and defraud Precision Discovery under their various schedules to the Leases and business arrangements.

25.     To that end, Defendants acted against well-established industry standards by continuing to charge Precision on a monthly basis for equipment that Precision should have owned outright and/or been able to pay vastly reduced fees to purchase

and/or continue to lease.  Specifically, whereas lessors ordinarily have the opportunity to purchase leased equipment outright upon the termination of a lease agreement – whether for a nominal fee or the fair market value of the leased equipment – Precision's lease agreements continually required Precision to pay for equipment well after the original term of the lease had expired.  It is obvious that the equipment suffered great amortization over the years, and the practice of continuing to charge Precision full lease fees for the equipment and merely roll up the charges from prior Schedules was plainly inappropriate.

26.    By way of example only, Schedule A to the Lease Agreement offered Precision the opportunity to purchase the equipment included in that schedule for one dollar upon expiration of the agreement.  However, Precision was never actually offered the opportunity to purchase the equipment included in Schedule A, and was charged for that equipment throughout the duration of the subsequent schedules to the Lease Agreement.  Likewise, contrary to industry practice, none of the subsequent schedules to the Lease Agreement offered Precision the opportunity to purchase the equipment included therein, which resulted in Precision paying for the equipment in sums far exceeding its fair market value.  In fact, these subsequent schedules contain language that purports to have ownership of any equipment that was leased by Precision revert to Hitachi upon execution of the new schedule – a blatantly improper provision.

27.    This practice, along with Holton's conflicted and compromised position, resulted in Precision failing to return unused and even obsolete equipment, which resulted in Precision paying substantially more than it would have had it simply purchased the equipment outright upon expiration of the schedule.

28.     Specifically, unbeknownst to the management of Precision Discovery, while Holton was ostensibly employed as the head of Precision Discovery's IT department, he was simultaneously engaged and receiving income as a contractor and/or consultant for Cold Creek.

29.     A former Cold Creek employee admitted to Precision Discovery that Cold Creek in fact had business cards made for Holton, but that Holton did not use the Cold Creek business cards because he did not like their quality.

30.     Likewise, while working for Precision, in addition to the inappropriate Schedule J transaction discussed below, Holton purchased substantial amounts of equipment from Defendants that was of no actual use to Precision, costing the Company in excess of $267,000.   Upon information and belief, Holton made these purchases in order to bolster sales commissions and thereby remain in the good graces of Cold Creek's sales employees.

31.     Similar to Holton's inappropriate contracting and consulting work for Cold Creek, HDS employees sought to work with Holton and other individuals on a new business venture while Holton was still employed by Precision Discovery – a suggestion to which Holton readily and improperly acceded.

32.     On February 27, 2017, Chris Barringer, a Services Sales Representative for HDS, sent an email to Holton and other individuals within HDS, stating that they were "forming a company" for the purpose of "collaborating business, app, social, [and] public enhancement . . ."   Barringer wrote that the new company would "take those ideas and determine which ones are actionable, have real potential, and work towards making them a reality."

33.     In a second email sent later the same afternoon, Barringer informed the group that Holton would draft a non-disclosure agreement in order to protect the new company's ideas that were shared within the group, and would research the best way to legally structure the new company.

34.     Shortly after Barringer's second email to the group, Holton requested that Barringer stop communicating with him via his Precision Discovery email address, writing, "Can you change my email for this to [Holton's personal account]."

35.     In addition to Holton's inappropriate business relationship with HDS and Cold Creek, all while Holton remained a Precision Discovery employee, Defendants invested substantial time and resources to improperly obtain Holton's loyalty by providing him with large and facially improper financial benefits and gifts, including luxury executive suite tickets to sporting events, sports memorabilia and expensive liquor, amounting to tens of thousands of dollars of handouts, to which Precision Discovery remained ignorant of at all times.

36.     By way of example only, on September 8, 2016, HDS gave Holton two luxury executive suite tickets to attend the Denver Broncos' opening day game against the Carolina Panthers.

37.     On September 9, 2016, Holton emailed a contact at HDS to request four more luxury suite tickets to see the Broncos play the Kansas City Chiefs over the Thanksgiving holiday weekend.   HDS's Rocky Mountain Regional Sales Manager, Steve Shattuck, contacted another HDS employee, writing, "Lorann, could [you] put Howard down for four [tickets] for KC?"   Within four minutes, HDS Account

Representative Billy Metting responded to Shattuck and Holton, stating, "I already have [Holton] down for KC." *See* Ex. 1.[4]

38.     At Holton's request, HDS also provided Holton with two luxury box tickets in the Citrix Owners' Club Suite for the San Francisco 49ers game against the New York Jets in San Francisco on December 11, 2016.

39.     In addition to the numerous sporting event tickets HDS gave Holton, Cold Creek also provided Holton with an excessive number of gifts in the form of meals and entertainment, including, but not limited to, celebrity bowling events with the Denver Broncos, high-end events at the Denver Zoo, golf outings, expensive shooting events and lavish meals.

40.     Upon information and belief, as an obvious reward for his years of subterfuge and disloyalty to Precision on HDS's behalf, following Holton's eventual termination from Precision, he accepted a lucrative, full-time position with HDS as its Director, Global Enterprise Architecture, United States, making him a prominent senior technology employee at HDS.

41.     By virtue of these actions, HDS and Cold Creek successfully purchased Holton's loyalty and cooperation at Plaintiff's expense, thereby acquiring a corrupted and disloyal agent within Precision Discovery that would make any arm's length transaction between the parties an impossibility.

42.     To be clear, Holton's inappropriately close relationship with HDS involved individuals who took part in the transactions and leases at issue in this action, and not merely random employees and agents of HDS and Cold Creek.   Indeed, Holton maintained an unusually close personal relationship with HDS's Billy Metting—the very

---

[4]        Citations to "Ex." refer to exhibits annexed hereto.

individual from HDS with whom Holton arranged the sham Schedule J transaction discussed in greater detail below.

43.     By way of example only, on September 8, 2015, Metting sent Holton an email asking if Holton was "still thinking about looking at [Metting's] Toyota Tacoma." Holton responded that he was "very much" still interested and requested photographs of the truck. *See* Ex. 2.

44.     Although the exact date on which Metting provided Holton with his truck is unclear, on October 20, 2015, Metting sent Holton an email with the subject, "Don't rob any banks or do any drive bys [*sic*] in my truck." In a separate email sent the same day, Metting further wrote, "Do[n't] give it back to me with blood on it either. Wash it." Shortly thereafter, Holton responded, simply stating, "**Not giving it back. We should talk and work something out**." *See* Ex. 3 (emphasis added).

45.     As another example, on October 26, 2015, Metting asked Holton, "What are you think[ing]? $3,000 or [Holton's Model 460 handgun] and $2,500." *Id.* Metting immediately sent a second email to Holton in which he stated, "How about $3,000 and I will throw in some Packers tickets?" Tellingly, this discussion demonstrates that the sports tickets that HDS and its representatives routinely provided to Holton free of charge were expressly part of a monetary quid pro quo relationship between Holton and HDS.

46.     Two minutes later, Holton responded to Metting, stating, "I was thinking $2,500. If you want the 460 you are in trouble. It is worth well more than $1000 and you would have to take the ammo as well, since I don't have any need for it without the pistol." The following day, Metting responded, "$2,500 is good . . . ." *See* Ex. 4.

47.    Although Metting and Holton had agreed on the sale of Metting's personal truck, Holton continued to try to sell Metting his firearms.  In an October 27, 2015 email to Metting, Holton wrote, "I did not mean to scare you off the 460, and I have other firearms if you are interested."  Metting responded, "I love how you say 'Firearms,'" to which Holton responded, "I'm crazy [E]ddie!" *Id.*

48.    In a December 2, 2015 email, Metting and Holton finalized the sale of Metting's truck to Holton.  Metting wrote, "Can you bring $2,500 for the truck to lunch Friday? I have the title in my car."  Approximately one hour later, Holton responded, "Will do." *See* Ex. 5.

49.    Thereafter, HDS and Cold Creek leveraged the gifts and close personal relationship that they had improperly purchased from Holton and seized upon the opportunity to fraudulently induce Precision Discovery into agreeing to Schedule J, thereby allowing HDSCC to charge exorbitant lease fees for blatantly unsuitable and insufficient data storage hardware.

50.    Indeed, after the execution of the sham Schedule J transaction, Cold Creek's President accompanied Holton and his wife on a shopping spree during which Holton purchased thousands of dollars in high-end alcohol at Cold Creek's expense, in a transparent attempt to reward Holton for his role in pushing through the sham transaction unbeknownst to Precision Discovery.

**<u>Schedule J and the G1000 Equipment Transaction</u>**

51.    On June 10, 2016, Cold Creek sent Holton an initial quote for the hardware, software and related services that Precision Discovery would lease pursuant to Schedule J.

52.     As discussed above, by virtue of Precision's relationship with Cold Creek and HDS, both Cold Creek and HDS were intimately aware of Precision's data storage needs and maintained a unique position of trust such that they were required and expected to recommend equipment that would be suitable for Precision's needs.

53.     However, in direct contravention of this obligation, neither HDS nor Cold Creek ever provided engineers to examine Precision's then-existing infrastructure needs to determine whether the G1000 was appropriate equipment.     Instead, Defendants proceeded to force Precision, through their double agent, Holton, into agreeing to accept equipment that was entirely ill-suited for Precision's needs.

54.     The only data storage hardware included in the June 10, 2016 quote was a G1000 Virtual Storage Platform (the "G1000 Equipment"), which provided for 1.188PB of total data storage, of which only approximately 783TB was actually usable. According to Schedule J, all of the existing HDSCC leased equipment that was already in Precision Discovery's possession was supposed to be returned by March 31, 2017, leaving Precision Discovery with only the G1000 hardware, software and some switches to operate its business – which would have been technologically impossible to do and would have required Precision Discovery to cease its eDiscovery operations and shut down the Company.   The return of all of the existing HDSCC leased equipment by March 31, 2017 was even separately verified by an HDS project manager, as discussed below.

55.     Given that Precision Discovery was already storing 2.38PB of data across all HDSCC-leased equipment — a fact which Defendants were aware as a result of their ongoing business relationship with Plaintiff — the G1000 Equipment could not possibly

meet Precision Discovery's ongoing data storage needs, and only provided a fraction of the data storage that Precision Discovery required to even maintain its then-current operations.

56.    Indeed, Precision Discovery subsequently uncovered evidence that HDS and Cold Creek never intended to migrate the data from Precision Discovery's existing hardware to the G1000 Equipment, proving that this was a sham transaction, with no benefit intended for Precision Discovery.

57.    Importantly, Precision Discovery has discovered an extremely revealing email exchange between Holton and Metting that was initiated by Metting on May 24, 2016.  Metting sent this email 18 days before Cold Creek even sent Holton its first quote for the G1000 Equipment.

58.    Metting's email stated: "Do you need migration services for the move from the HUSvm's/HUS150 to the new G100[0]?  Thanks."  However, Holton then revealed the bogus nature of the G1000 transaction (specifically, that the equipment was never intended to be used by Precision to house its existing data, but was purely cover for adding enormous additional charges to Precision Discovery) when he responded with "No.  Installation only."  *See* Ex. 6.

59.    This email exchange demonstrates that Defendants and their agent, the disloyal Precision Discovery employee it had acquired, knew and did not care that the 2.38PB data storage environment could not be migrated onto outmoded equipment capable of only storing 1.421PB.  Instead, Defendants were seeking to offload the unsuitable G1000 Equipment onto Precision Discovery, knowing that it could not be used for the Company's core eDiscovery business, which is exactly what has

happened, as the G1000 Equipment continues to be unused and useless in Precision Discovery's facilities.

60.     Cold Creek's initial quote for Schedule J was for an aggregate total of $1,800,000.00, of which $652,700.46 was attributable to the G1000 Equipment hardware, with the remainder being purportedly for the purposes of the G1000 Equipment software, support and services.

61.     As a clear indication that Defendants were offering the transaction in bad faith and simply as a means of defrauding Precision Discovery, the initial quote also included two Brocade switches, which, with associated costs for installation and maintenance, added an additional $64,630.30 to the cost of Schedule J to the Company.

62.     Both HDS and Cold Creek were aware that these Brocade switches were unnecessary, as, pursuant to Schedules A through I to the Lease Agreement, Precision Discovery already had a large inventory of switches in its possession that would work with the G1000 Equipment.   This was a transparent effort to run up of costs by Defendants at the expense of Precision Discovery with the full cooperation of Holton as a disloyal employee.

63.     Furthermore, another email provides further evidence of Defendants' fraudulent intent and overcharging behind the G1000 transaction, in which the President of Cold Creek wrote to Metting on June 8, 2016, stating, "Long and short, I want to increase the size of this June sale with a refresh of all their brocade equipment.  If this can be done, it could be fairly lucrative (I think).  See what you can do.  Let me know how I can help."

64.     Recognizing that the initial quote could not possibly be sufficient for Precision Discovery's data storage needs and would in essence force Precision to shut down its operations, and in a transparent effort to avoid raising red flags, Holton had no choice but to request yet more hardware with additional data storage capacity apart from what had been contained in Schedule J in order to handle the Company's existing data storage needs, and the potential to expand to account for additional data storage needs in the future.   However, as described below, Holton never actually intended for Precision Discovery's data to be migrated to the equipment leased pursuant to Schedule J, and Precision Discovery would be required to pay exorbitant amounts as an effective "ransom" to retain the data storage equipment that it already possessed and utilized.

65.     On or about June 27, 2016, Cold Creek sent Holton a second quote for the hardware, software and related services Precision Discovery would lease pursuant to Schedule J.

66.     Tellingly, even this June 27, 2016 quote provided for a mere 20% of additional data storage, for a total of 930.64TB of total usable capacity, still far short of Precision Discovery's actual needs.

67.     Thus, despite having direct knowledge of Precision Discovery's IT infrastructure and data storage needs, and specifically being asked to provide equipment sufficient to meet those needs, both of Cold Creek's quotes provided for a fraction of the data storage hardware that the Company required.

68.     Incredibly, and despite this fact, on September 9, 2016, Holton executed Schedule J on behalf of Precision Discovery.

17

69.     Schedule J had an effective date of October 1, 2016, and a term of forty-eight months.

70.     Pursuant to the terms of Schedule J, Precision Discovery was required to pay monthly rent of $103,500.00, with monthly taxes of $4,398.75, for an aggregate monthly total of $107,898.75.

71.     Thus, the total value of Schedule J was $5,179,140, of which more than $4,000,000 was comprised of "phantom profits" for HDSCC, HDS's leasing arm.  This lease, which posed as an IT data storage overhaul, was therefore a textbook fraudulent transaction predicated on all form and no substance.

72.     Schedule J would have effectively required that Precision Discovery cease its core business operations or submit to additional exorbitant charges simply to maintain its current systems as well, as the G1000 Equipment was already considered obsolete at HDS and its storage capacity was insufficient to meet Precision Discovery's data storage needs, of which both HDS and Cold Creek were fully aware.

73.     This scheme is revealed by the coercive terms of the lease itself, as Schedule J further required that Precision Discovery return all previously leased hardware and software by March 31, 2017 or pay an additional $20,000.00 per month in rent to retain the data storage hardware identified in Schedules G through I to the Lease Agreement (as Precision Discovery would be forced to do because to the G1000 Equipment's obvious unsuitability as a replacement for the current systems and equipment).

74.     Therefore, unless it paid this $20,000 effective ransom on a monthly basis, Precision Discovery would not have the hardware necessary to maintain its existing eDiscovery business.

75.     In fact, the $20,000 per month payment to retain the equipment in Schedules A through I further reflects the sham nature of Schedule J and that the $103,500 monthly payment was nothing more than phantom profits payable to HDSCC (and Defendants, by proxy).  By charging Precision $103,500 per month to lease the wholly insufficient G1000 Equipment, while simultaneously charging Precision an additional $20,000 per month to retain the equipment already in Precision's equipment, Defendants further revealed their dishonest and fraudulent practices.

76.     Indeed, Defendants' scheme aimed to charge Precision inflated and inappropriate fees for a piece of equipment useless to Precision (which exorbitant fees were previously being paid by Precision instead for the old Schedules A-I equipment, right up until Schedule J was prepared), and the structure of Schedule J demonstrates that the true value in 2016 of all of the equipment leased under Schedules A through I was, by Defendants' admission through Schedule J, no more than a mere $20,000 per month (and therefore was likely far less in reality).

77.     Moreover, whereas Precision and HDS previously had an agreement whereby Precision paid HDS $120,000 per year to service Precision's existing equipment obtained under Schedules A through I, upon inception of Schedule J, Precision was required to pay HDS $600,000 per year to service its equipment under Schedule J.

78.     In addition to leaving Precision Discovery with too little storage capacity for its business operation needs, Defendants knew that the G1000 Equipment was blatantly unsuitable and insufficient for Precision Discovery's core eDiscovery needs.

79.     The G1000 Equipment had an original release date of April 23, 2014, and HDS itself had published on its website in October 2016 that the technology should be upgraded to the G1500.

80.     By working in conjunction with the disloyal employee that HDS and Cold Creek had unethically purchased from one of Precision Discovery's most senior employees, Defendants fraudulently induced the Company to enter into Schedule J, which was unsuitable for Precision Discovery's business needs, was used to mask vast overcharges on various HDS equipment and which deceptively pawned off nearly obsolete data storage hardware at grossly inflated prices.

**Falsified Installation Certificate and Invalid Lease Agreement**

81.     Pursuant to the terms of the Lease Agreement, Precision Discovery was required to execute an Installation Certificate on the date the equipment was properly and completely installed, in accordance with the standards set forth by HDS's Professional Services Group.  Crucially, HDSCC was not legally entitled to receive any lease payments under Schedule J without first obtaining a signed (and legitimate) Installation Certificate from Precision Discovery.

82.     On September 8, 2016, Metting sent Precision Discovery a copy of both Schedule J and an Installation Certificate for Precision Discovery to sign.

83.     At this point, the G1000 Equipment had not even been shipped to Precision Discovery, yet HDS was already soliciting Holton to fraudulently sign the Installation Certificate.

84.     Crucially, HDSCC would not release large monetary payments to Cold Creek or the HDS sales team on the Schedule J transaction until the Installation Certificate was signed and returned.

85.     On September 9, 2016, Holton, working on behalf of Defendants, returned an executed copy of Schedule J to HDS, but, because the equipment listed on Schedule J had not yet been installed, Precision Discovery was unable to execute or return the Installation Certificate.

86.     Although Holton sent the executed Schedule J to Metting at HDS, on September 9, 2016, Schwappach of Cold Creek responded to Holton, stating "This is awesome! Thank you very much for the business.  Now making sure it goes smooth from my end.  Congratulations on your purchase."

87.     Moreover, shortly after Holton returned the executed Schedule J, he contacted Precision Discovery's CEO, Jerry Barbanel, in New York, writing, "Please have the check cut for first (current) and last lease payment ASAP and let me know the tracking or wire information so I can get it to [H]itachi.  They won't ship until that happens."

88.     In a September 20, 2016 email, Cold Creek's President informed Holton that the G1000 Equipment was not even scheduled to ship (to say nothing of being installed) until that day.  Specifically, Cold Creek's Paul Schwappach wrote, "Looks like the G1000 will ship today!!! I'll let you know when the shipping is confirmed."  *See* Ex. 7.

89.     Later that same afternoon, Schwappach sent Holton another email stating, in effect, that the HDS and Cold Creek sales teams would not receive their commissions until the Company returned the completed Installation Certificate and pressuring Holton to therefore execute and return it.

90.     In so doing, Cold Creek, on behalf of itself and HDS, once again exercised its unethical and unlawful control over Holton, which they had corruptly bought and paid for, by pushing him to return a false and fraudulently executed Installation Certificate that falsely stated that the G1000 Equipment had been installed, when it had had not even been **shipped or delivered**.

91.     On September 21, 2016, Holton conclusively demonstrated that his loyalties lay with Defendants when he acceded to Schwappach's demand that he return a falsified installation certificate, stating:

> (1) the Equipment listed [on Schedule J] has been:  (a) inspected by authorized representatives of Lessee; and (b) accepted by Lessee for leasing under the Lease and has become subject to and governed by the provisions of the Lease; (2) Lessee is obligated to pay Rent and all other sums provided for in the Lease with respect to the Equipment; (3) the Installation Date is 9/22/2016; and (4) an authorized officer of Lessee has executed this Acceptance Certificate.

92.     To be clear, contrary to Holton's fraudulent representations in the Installation Certificate, the equipment listed on Schedule J had neither been inspected by Precision Discovery nor actually installed as of September 22, 2016.

93.     Indeed, underscoring the fact that Defendants were aware that the Installation Certificate had been fraudulently executed is the fact that Holton dated his signature September 21, 2016 but claimed **on the same document** that the installation did not happen until one day later, on September 22, 2016.  The installation very

obviously could not have been witnessed a day before it supposedly happened, especially considering that the equipment was, in fact, **never** installed.

94.    In reality, and as Defendants were aware, the G1000 Equipment remained unplugged and was not moved to Precision Discovery's private cage in Precision Discovery's data center for 48 days until November 8, 2016.

95.    In fact, even the partial basic installation for the G1000 Equipment did not happen until on or around **January 9, 2017**.

96.    To date, HDS has never properly completed the full installation of the G1000 Equipment, and the G1000 Equipment has never been used by Precision Discovery for its core business operations, as it was never technologically feasible that the G1000 could handle Precision Discovery's data storage needs – thus rendering the G1000 completely unworkable for Precision Discovery.

**Defendants' Fraud and Deceptive Practices are Revealed**

97.    On November 2, 2016, HDS Project Manager Sarah Reynolds sent an email to Holton, and two other Precision Discovery employees, Jason Piper and David Tran, in which she made clear the consequences to the Company of adhering to Schedule J.  Specifically, Reynolds wrote that "All the equipment on the attached leases is due back 3/31/2017 as per the new lease.  Once that is back, the only equipment that will be on the lease is (2) VSP G1000 HW 1,412,000 GB (333-4TB; 50-1.6TB) & SW; (1) HCP SW; and (2) BROCADE G620."  *See* Ex. 8.

98.    Reynolds's email confirmed that, pursuant to Schedule J, Precision Discovery's eDiscovery operations could be forced to cease as of March 31, 2017, as: (1) HDSCC was requiring Precision Discovery to return all of the computing equipment

the Company had previously leased; (2) HDSCC was requiring Precision Discovery to return all of its 2.38PB of data storage across all of its then-existing HDS equipment; and (3) the only HDS equipment that Precision Discovery would retain was the G1000 Equipment, which did not even have enough data storage to handle Precision Discovery's existing client data storage needs.

99.     In an obvious effort to cover up Defendants' malfeasance, Holton sent an email to Piper and Tran in which he stated, "Ignore this for now.   More information forthcoming." *See* Ex. 9.

**Holton's Termination and Precision Discovery's Investigation**

100.    Ultimately, Holton was terminated as the head of Precision Discovery's IT department on March 27, 2017.

101.    The Company first discovered the fraudulent nature of Schedule J and the G1000 Equipment transaction shortly after Holton's termination.   Fearing that this was not the only instance in which Defendants had attempted to defraud it, the Company retained independent forensic accountants to conduct an investigation regarding Schedule J, the G1000 Equipment transaction and all prior schedules to the Lease Agreement.

102.    The investigation conducted by its forensic accountants confirmed Precision Discovery's fears and revealed that Defendants, working in concert with their agent, Holton, had perpetrated a scheme to systematically defraud Precision Discovery into making approximately $2.5 million in overpayments over the prior six years.

103.    By way of example, the forensic accountants determined that, for Schedules A through I, HDSCC charged Precision Discovery monthly lease payments

that were in excess of the number of payments that should have been made under the terms of the respective schedule to the Lease Agreement.  These overpayments to HDSCC were extremely difficult to detect, as they were the result of HDSCC's business practice of rolling Precision Discovery's existing leases into new leases, and then overcharging Precision Discovery large amounts for equipment that was actually already included in the prior leases.

**FIRST CAUSE OF ACTION**
**(Fraudulent Inducement)**

104.    Precision Discovery repeats and realleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

105.    Defendants represented that the data storage equipment identified on Schedule J was suitable for Precision Discovery's data storage and IT infrastructure needs.

106.    Defendants knew that their representations were false, as HDS and Cold Creek were each aware that Precision Discovery had at least 2.38PB of data storage across its HDS equipment, and that the 1.412PB of data storage provided for in Schedule J, of which 930.64TB was usable, was insufficient to meet Precision Discovery's data storage and IT infrastructure needs.

107.    Defendants further misrepresented the sufficiency of the equipment identified in Schedule J with the purpose of inducing Precision Discovery to rely on their misrepresentations and to enter into the deceptive and fraudulent Schedule J.

108.    In addition, the Installation Certificate, based on which the fraudulent Schedule J was thought to have gone into effect, was knowingly executed by Defendants through their agent under false representations (i.e., that the equipment had

been shipped, delivered and installed) and falsified. Therefore, any representation or claims made by Defendants that any payment was due under Schedule J are false and have been made without legal basis and to the extreme detriment of Precision Discovery, which has paid several hundred thousand dollars under the fraudulent and unenforceable lease.

109.   Relying upon Defendants' misrepresentations regarding the equipment identified in Schedule J, Precision Discovery agreed to the terms of Schedule J.

110.   As a result of Precision Discovery's reliance on Defendants' misrepresentations, Precision Discovery has suffered damages.

## SECOND CAUSE OF ACTION
### (Fraud and Fraudulent Misrepresentation)

111.   Precision Discovery repeats and realleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

112.   Defendants were aware of Precision Discovery's existing IT infrastructure and data storage needs at the time the parties negotiated the terms of the Schedule J transaction.

113.   Despite their knowledge of Precision Discovery's existing IT infrastructure and data storage needs at the time the parties negotiated the terms of the Schedule J transaction, Defendants fraudulently misrepresented that the equipment provided for in Schedule J was suitable for Precision Discovery's business needs.

114.   Defendants also misrepresented the total cost of the Schedule J transaction to Precision Discovery, including misrepresenting the total cost of the G1000 Equipment leased thereunder, by leasing unnecessary Brocade switches in order to make the transaction "fairly lucrative," by charging Precision Discovery $20,000 per

month for equipment it had already leased under prior schedules to the Lease Agreement and by including over $4,000,000 in "phantom profits."

115.    Exercising their unethical and unlawful control over Holton, on September 21, 2016 Defendants also procured a falsely and fraudulently executed Installation Certificate stating that the G1000 Equipment had been installed when, in reality, the G1000 equipment had just  been shipped and delivered – but remained unplugged and in a storage area for 48 days.

116.    Defendants made these fraudulent misrepresentations, as well as other knowing misrepresentations, during and over the course of negotiating the Schedule J transaction with the intention of inducing Precision Discovery to agree to the fraudulent Schedule J transaction, and thereby defrauding Precision Discovery out of hundreds of thousands of dollars, and attempting to defraud it out of millions of dollars.

117.    Defendants knew that their misrepresentations were false.

118.    Precision Discovery relied upon Defendants' misrepresentations in entering into the fraudulent Schedule J transaction.

119.    As a result of Defendants' fraudulent misrepresentations, Precision Discovery has suffered damages.

### THIRD CAUSE OF ACTION
### (Civil RICO)

120.    Precision Discovery repeats and realleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

121.    Defendants operated an enterprise engaged in interstate commerce through a pattern of racketeering activity.

122.    Defendants committed two or more predicate acts of racketeering activity.

123.   Defendants' actions affected interstate or foreign commerce in that they were committed using both interstate mail and wires.

124.   By way of example only, beginning in approximately June 2016, Defendants began relying upon mail and wires, including email, to fraudulently induce Precision Discovery into entering into the sham Schedule J transaction.

125.   Likewise, on or about September 9, 2016, Cold Creek sent email messages requesting that Holton fraudulently represent that the G1000 Equipment had been installed by returning a falsified Installation Certificate.  In ultimately heeding to Cold Creek's request, Holton used the mail system and wires to return the falsified Installation Certificate.

126.   Additionally, Precision Discovery's forensic accountants uncovered evidence that Defendants' fraudulent and deceptive lease practices have extended back to approximately January 2012.  To that end, Defendants, working in conjunction with Holton, routinely abused industry standards in order to continue overcharging Precision for equipment well after Precision should have owned the leased equipment outright.

127.   Defendants' pattern of racketeering activity existed for a significant amount of time prior to the execution of the sham Schedule J transaction and poses a threat of continued criminal conduct beyond the period during which their predicate racketeering activity has already occurred.

128.   As a result of Defendants' Civil RICO violations, Precision Discovery has suffered damages.

## FOURTH CAUSE OF ACTION
### (Civil Conspiracy)

129.   Precision Discovery repeats and realleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

130.   Defendants, working in concert with their agent, Holton, worked together to defraud Precision Discovery out of millions of dollars to which they had no legitimate right.

131.   Defendants acted in furtherance of their agreement to defraud Precision Discovery by knowingly inducing Precision Discovery to accept lease equipment which was nearly obsolete and entirely unsuitable for Precision Discovery's business purposes, and by systematically overcharging Precision Discovery pursuant to a lease for both that equipment and Precision Discovery's existing equipment already in its possession.

132.   Defendants acted in furtherance of their agreement to defraud Precision Discovery by exercising their undue control over Holton in order to procure on September 21, 2016 a falsely and fraudulently executed Installation Certificate stating that the G1000 Equipment had been installed when, in reality, it had just been shipped or delivered – but remained unplugged and in a storage area for 48 days.

133.   Defendants' participation in furtherance of their combined plan or purpose to defraud Precision Discovery was intentional.

134.   As a result of HDSCC's, HDS's and Cold Creek's agreement to defraud Precision Discovery, and their actions taken in furtherance thereof, Precision Discovery has suffered damages.

**FIFTH CAUSE OF ACTION**
**(Breach of the Implied Warranty of Good Faith and Fair Dealing)**

135.   Precision Discovery repeats and realleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

136.   Defendants were aware of Precision Discovery's existing IT infrastructure and data storage needs when they negotiated the terms of the fraudulent Schedule J transaction.

137.   By fraudulently inducing Precision Discovery to enter the sham Schedule J transaction, Defendants failed to act honestly, reasonably, fairly and in good faith.

138.   By fraudulently inducing Precision Discovery to enter the sham Schedule J transaction, Defendants have destroyed and/or injured Precision Discovery's right to receive the fruits of the Lease Agreement.

139.   By fraudulently inducing Precision Discovery to enter the sham Schedule J transaction, Defendants breached the implied duty of good faith and fair dealing implicit in all contracts that are governed by Colorado law.

140.   As a result of HDSCC's, HDS's and Cold Creek's breach of the implied warranty of good faith and fair dealing, Precision Discovery has suffered damages.

**SIXTH CAUSE OF ACTION**
**(Tortious Interference with Contract and Business Relations)**

141.   Precision Discovery repeats and realleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

142.   HDS and Cold Creek were aware of the Lease Agreement and related schedules thereto between Precision Discovery and HDSCC.

143.   HDS and Cold Creek intentionally procured Precision Discovery's breach of the Lease Agreement and Schedules thereto by inducing it to enter into a Schedule that would effectively require Precision Discovery to cease its eDiscovery operations.

144.   HDS and Cold Creek, through their actions, in fact caused Precision Discovery to breach the Lease Agreement.

145.   As a result of HDS's and Cold Creek's tortious interference, Precision Discovery has suffered damages.

## SEVENTH CAUSE OF ACTION
### (Aiding and Abetting Fraud)

146.   Precision Discovery repeats and realleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

147.   Holton defrauded Precision Discovery by, *inter alia*, representing that the G1000 Equipment was suitable for Precision Discovery's IT infrastructure and data storage needs and by executing and returning a fraudulent and false Installation Certificate representing that the G1000 Equipment had been properly and completely installed.

148.   Holton and Defendants were aware that Holton's statements and representations were false, and Defendants actively sought and supported Holton's deceptive and fraudulent conduct.

149.   Plaintiff was unaware that Holton's false and misleading representations concerning the adequacy and suitability of the G1000 Equipment were false, or that Holton had executed and returned the false and fraudulent Installation Certificate.

150.   Plaintiff relied upon Holton's false and fraudulent misrepresentations.

151.   Defendants knowingly participated in, aided and abetted Holton's fraudulent conduct, as they actively and substantially assisted in Holton's deceptive behavior, including recruiting and working with a disloyal Precision Discovery employee in order to bilk Precision Discovery out of millions of dollars to which they were not entitled and coercing Holton to execute a fraudulent and false Installation Certificate so that HDSCC, HDS and Cold Creek salespeople could receive lucrative commissions.

152.   As a result of Defendants' actions in aiding and abetting Holton's fraudulent conduct, Precision Discovery has suffered damages.

## EIGHTH CAUSE OF ACTION
### (Aiding and Abetting Conversion)

153.   Precision Discovery repeats and realleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

154.   HDSCC committed a conversion against Precision Discovery by accepting and keeping funds it received from Precision Discovery pursuant to the terms of the fraudulent Schedule J transaction.

155.   Both HDS and Cold Creek were aware that the equipment provided for in the Schedule J transaction was both nearly obsolete and entirely unsuitable for Precision Discovery's business needs.

156.   By negotiating the terms of the Schedule J transaction with Holton, they substantially assisted HDSCC in committing conversion against Precision Discovery.

157.   As a result of HDS's and Cold Creek's actions in aiding and abetting HDSCC's conversion, Precision Discovery has suffered damages.

## NINTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty)

158.   Precision Discovery repeats and realleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

159.   Howard Holton had a fiduciary duty to Precision Discovery as one of its most senior executive employees.

160.   Defendants were at all times aware of Holton's fiduciary duty to Precision Discovery.

161.   Holton breached his fiduciary duty to Plaintiff by, *inter alia*, agreeing to the Schedule J transaction while knowing that the equipment provided by Defendants was plainly insufficient for Precision Discovery's needs, by falsely executing the Installation Certificate for the G1000 Equipment despite knowing that the equipment had never even been installed and by forcing Precision to systematically overpay for equipment and services it never used, all to profit Defendants.

162.   Defendants knowingly aided and abetted Holton's breach of his fiduciary duty to Plaintiff by conspiring with Holton to negotiate the terms of Schedule J, by compelling him to sign the fraudulent Installation Certificate and by working with him to steal millions of dollars from the Company by systematically overcharging it for services that were never delivered.

163.   As a result of Defendants' actions in aiding and abetting Holton's actions, Precision Discovery has suffered damages.

**TENTH CAUSE OF ACTION**
**(Aiding and Abetting Breach of the Duty of Loyalty)**

164.   Precision Discovery repeats and realleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

165.   As a Precision Discovery employee, Holton owed Precision Discovery a duty of loyalty, pursuant to which, Holton was, at all times, required to act solely for the benefit of Precision Discovery.

166.   Defendants were at all times aware of Holton's duty of loyalty owed to Precision Discovery.

167.   Holton breached his duty of loyalty to Plaintiff by failing to act in the best interest of Precision Discovery, including by, *inter alia*, agreeing to the Schedule J transaction while knowing that the equipment provided by Defendants was plainly insufficient for Precision Discovery's needs, by falsely executing the Installation Certificate for the G1000 Equipment despite knowing that the equipment had never even been installed and by forcing Precision to systematically overpay for equipment and services it never used, all to profit Defendants.

168.   Defendants knowingly aided and abetted Holton's breach of his duty of loyalty to Plaintiff by conspiring with him to negotiate the terms of Schedule J, by compelling him to sign the fraudulent Installation Certificate and by working with him to steal millions of dollars from the Company by systematically overcharging it for services that were never delivered.

169.   As a result of Defendants' actions in aiding and abetting Holton's actions, Precision Discovery has suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff Precision Discovery respectfully requests that an award be issued in its favor on the claims asserted herein containing the following relief:

(a)     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Precision Discovery for all monetary and/or economic damages;

(b)     An award of costs and expenses, as well as reasonable attorneys' fees, that Plaintiff incurred in this action to the fullest extent permitted by law;

(c)     An award of damages for any and all other monetary and/or non-monetary losses suffered by Precision Discovery in an amount to be determined at trial, plus prejudgment interest;

(d)     An award of punitive and other liquidated and/or exemplary damages to the greatest extent permitted under the law;

(e)     An award of treble damages under applicable law; and

(f)     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff Precision Discovery hereby demands a trial by jury on all issues of fact and damages in connection with the claims stated herein.

Respectfully submitted this 5th day of October, 2015.

s/ *Jamey W. Jamison*

Jamey W. Jamison
Dino G. Moncecchi
HARRIS, KARSTAEDT, JAMISON & POWERS, P.C.
10333 E. Dry Creek Road, Suite 300
Englewood, Colorado 80112
Phone:  720-875-9140
Fax:     720-875-9141
jjamison@hkjp.com
dmoncecchi@hkjp.com
ATTORNEYS FOR PLAINTIFFS